IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT MISSISSIPPI
No.:

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
JUN 10 2010
BY____ J. T. NOBLIN, CLERK
              DEPUTY

| | |
|---|---|
| CAPTAIN KENNY BARHANOVICH, an individual<br><br>Plaintiff,<br><br>v.<br><br>BP, plc, BP PRODUCTS NORTH AMERICA, INC., BP AMERICA, INC., TRANSOCEAN, LTD., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER INC., HALLIBURTON ENERGY SERVICES, INC., and CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION,<br><br>Defendants | 1:10cv258 HSO-JMR<br><br>**CLASS ACTION**<br>**COMPLAINT**<br><br>Demand for Jury Trial |

## COMPLAINT

Plaintiff Captain Kenny Barhanovich ("Plaintiff"), by and through his undersigned counsel, brings this action against Defendants BP, plc, BP Products North America, Inc., BP America, Inc., Transocean, Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Halliburton Energy Services, Inc., and Cameron International Corporation (collectively, "Defendants"), and avers the following facts and claims upon knowledge as to matters relating to himself and upon information and belief as to all other matters:

## INTRODUCTION

This is a state action brought to recover damages suffered by Plaintiff resulting from the oil spill caused by an explosion which occurred on the semi-submersible drilling rig Deepwater Horizon, on April 20, 2010. The explosion, fire and sinking of the Deepwater Horizon has resulted in an oil spill of devastating proportions in the Gulf of Mexico that is presently threatening the coastline of Louisiana, Mississippi, and Alabama. The oil spill threatens the wetlands, estuaries and national fisheries of the Gulf States, including Louisiana, Mississippi, Alabama, Texas, and Florida. The areas which have been damaged and/or will be damaged by the spill are those areas used by Plaintiff to earn his livelihoods through commercial fishing and the operation of his charter vessel. The timing of the spill is disastrous because this is a peak spawning and nesting season for many species of fish and other marine creatures, many of which that have significant commercial importance. Experts have consequently warned that the oil spill could result in a multi-decade impact and a long-term poisoning of the area.

## JURISDICTION AND VENUE

1. This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332 because it is a state action in which Plaintiff is a citizen of a State that is different than the State where at least one Defendant is incorporated or does business, and because the amount in controversy of this class action exceeds the jurisdictional limit of this Court.

2. Prosecution of this action in this district is proper under 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

3. Jurisdiction is also appropriate under 43 U.S.C. §1331, which extends federal jurisdiction to the outer Continental Shelf.

## PARTIES

4. Plaintiff Captain Kenny Barhanovich is a well known resident of Biloxi, Mississippi. Captain Barhanovich earns his income as a commercial fisherman and as the operator of a charter vessel in the Gulf of Mexico.

### Defendant BP

5. Defendant BP, plc is a foreign corporation doing business in the state of Mississippi and this district;

6. Defendant BP Products North America, Inc. is a foreign corporation doing business in the state of Mississippi and this district.

7. Defendant BP America, Inc. is a foreign corporation doing business in the state of Mississippi and this district.

8. The foregoing BP Defendants are hereinafter collectively referred to as "BP."

### Defendant Transocean

9. Defendant Transocean, Ltd. is a foreign corporation doing business in the state of Mississippi and this district.

10. Defendant Transocean Offshore Deepwater Drilling, Inc. is a foreign corporation doing business in the state of Mississippi and this district.

11. Defendant Transocean Deepwater, Inc. is a foreign corporation doing business in the state of Mississippi and this district.

12. The foregoing Transocean Defendants are hereinafter collectively referred to as "Transocean."

**Defendant Halliburton**

13. Defendant Halliburton Energy Services, Inc. is a foreign corporation doing business in the state of Mississippi and this district.

**Defendant Cameron**

14. Defendant Cameron International Corporation f/k/a/ Cooper-Cameron Corporation is a foreign corporation doing business in the state of Mississippi and this district.

## FACTUAL ALLEGATIONS

**The Explosion, Fire, and Sinking of the Deepwater Horizon.**

15. On April 20, 2010, an explosion occurred on the Deepwater Horizon floating oil rig that was located about 41 miles off the coast of Louisiana. The Deepwater Horizon was at all times owned by Defendant Transocean Ltd and operated by Defendant BP.

16. Defendant BP is the holder of a lease granted by the Minerals Management Service that allows BP to drill for oil and perform oil-production-related operations at the site of the and oil spill, and on April 20, 2010 operated the oil well that is the source of the oil spill.

17. According to Transocean's web site, the Deepwater Horizon was a semi-submersible drilling unit built in 2001 that could drill in water up to 8,000 feet deep.

18. At the time of the explosion, the Deepwater Horizon was drilling an exploration well that was not producing, and was completing the concrete casing of a well drilled to a depth of 18,000 feet.

19. It is believed that the amount of oil beneath the seabed that the Deepwater Horizon was tapping is in the tens of millions of barrels.

20. Prior to the explosion, Defendant Halliburton was engaged in cementing operations of the well and well cap.

21. In an April 30, 2010 press release Halliburton stated that it "performed a variety of services on the rig, including cementing, and had four employees stationed on the rig at the time of the accident . . ." and that it "had completed the cementing of the final production casing string in accordance with the well design approximately 20 hours prior to the incident . . ." Halliburton had not yet placed "the final cement plug which would enable the planned temporary abandonment of the well."

22. The cementing process is supposed to prevent oil and natural gas from escaping a well by filling gaps between the outside of the well pipe and the inside of the hole bored into the ocean floor.

23. When cement develops cracks or does not set properly, oil and gas can escape, ultimately flowing out of control.

24. Officials at Transocean have speculated that a pressure surge known in the oil and natural-gas industry as a blowout may have triggered the explosion and fire.

25. The explosion on the Deepwater Horizon resulted in a massive fire and led to the deaths of 11 crew members.

26. After burning for more than a day, a second explosion on April 22, 2010 caused the Deepwater Horizon to sink in approximately 5,000 feet of water.

**The Resulting oil spill.**

27. On or about April 23, 2010, the U.S. Coast Guard stated that no oil appeared to be escaping from the well head on the ocean floor.

5

28. On or about April 24, 2010, Defendants BP and Transocean discovered, with the use of remote operating vehicles, that oil was escaping from two leaks in a drilling pipe about 5,000 feet below the surface. The leaks appeared to be releasing in excess of 5,000 barrels a day.

29. With the use of remote operating vehicles on or about April 24, 2010, defendants BP and Transocean attempting to switch on a "blowout valve," or "blowout preventer" which is part of a 50 foot tall and 18 foot wide housing on the sea floor. Initial attempts to trigger the blowout valve have failed.

30. Defendant Cameron manufactured and/or supplied the Deepwater Horizon's blowout valve that failed to operate under the explosion, which should have prevented the oil spill.

31. The blowout valve or blowout preventer was not equipped with a remote control shutoff device called an acoustic switch. An acoustic switch allows the remote control triggering of a blowout preventer and is intended as a last resort safeguard device.

32. Two major oil-producing countries, Norway and Brazil, require the use of acoustic switches.

33. On or about April 24, 2010, officials stated that it might take at least two or three months to drill a relief well to stop what was assumed at that time to be a 1,000 barrel a day leak.

34. By April 25, 2010, the oil spill covered 600 square miles and was spreading north to about 70 miles from the Mississippi and Alabama coastline.

35. By April 26, 2010, the oil spill stretched 80 miles across the Gulf and was 36 miles southeast of Louisiana.

36. By April 27, 2010, government officials considered setting fire to the oil spill, which had grown to 100 miles across and was approximately 20 miles off the Louisiana coast. .

37. The oil spill was within 20 miles east of the mouth of the Mississippi River by April 28, 2010, and BP performed a controlled test to burn the leaking oil that afternoon.

38. On April 28, 2010 the National Oceanic and Atmospheric Administration ("NOAA") reported that workers had finished a containment chamber built to collect oil escaping from the well at the seafloor. NOAA also reported that the U.S. Coast Guard would move ahead with a plan to burn off some of the crude from the oil spill and continue to apply oil dispersants.

39. On April 29, 2010, NOAA reported that estimates of the oil release rate increased to 5,000 barrels (210,000 gallons) per day based on surface observations and reports of a newly discovered leak in the damaged piping on the sea floor. NOAA reported that the oil spill was declared a Spill of National Significance ("SONS"), which is defined as, "a spill that, due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge" and allows greater federal involvement.

40. As of June 8, 2010, Defendants efforts to control the oil spill had proved relatively fruitless, and the oil spill further expanded in size. NOAA made the following map of the oil spill's trajectory and areal extent:



41. In BP's exploration plan, which allowed it to avoid filing a more detailed site-specific plan, BP outlined a worst-case scenario of a spill of 162,000 gallons a day. BP did not outline in its exploration plan how it would respond to a potential blowout scenario.

42. After the explosion, the scale of the oil spill required BP to get assistance from the Coast Guard, other federal agencies and other oil companies to help with the clean-up effort.

43. As of May 18, 2010, the oil spill made landfall in Louisiana and is expected to make landfall in Alabama and Mississippi imminently.

44. BP has also acknowledged that the spill is worse than what they initially believed and in excess of 5,000 barrels a day.

45. Credible scientific studies indicate that the spill is in excess of 50,000 barrels a day. The oil is just now striking the environmental seashore in Louisiana estuaries and coastline.

**The oil spill's Impact on the Gulf's Fisheries**

46.     There are a wide variety of commercially valuable fish species in the Gulf of Mexico that will be harmed by the oil spill, including shrimp species, crabs, oysters, and finfish.

47.     According to NOAA and credible scientific evidence, commercial fishermen in the Gulf of Mexico harvested 1.27 billion pounds of finfish and shellfish that earned $659 million in total landings revenue in 2008.

48.     Major shrimp species in the Gulf of Mexico include white shrimp, pink shrimp and brown shrimp, are mainly located in coastal areas. During the spring, the young, or postlarvae, migrate from coastal areas.

49.     According to NOAA and credible scientific evidence, harm to these shrimp will increase as the oil spill approaches nearshore areas. Shrimp species will be harmed due to mortality of adults, as well as postlarvae. In particular, brown shrimp postlarvae will be migrating out of inshore waters from February to April, while white shrimp will begin migration in May and continue through November.

50.     According to NOAA and credible scientific evidence, the oil spill could not only harm shrimp catches this year, but also next year if postlarvae mortality is high.

51.     According to NOAA and credible scientific evidence, the Gulf region landings of shrimp are the nation's largest with 188.3 million pounds or 73 percent of the national total.  In addition, shrimp is a food force for a large fish population such as trout, redfish, blackfish, black dum, etc. The impact is much more significant as many Mississippi Shrimpers also hold Alabama and Texas licenses.

52. According to NOAA and credible scientific evidence, the Gulf region also leads the nation in the production of oysters, with 67 percent of the nation's total. The following landings and dockside value was produced in 2008 in the Gulf states: Louisiana, 12,778,311 pounds, $38.8 million; Texas, 2,679,207 pounds, $8.83 million; Mississippi, 2,610,349 pounds, $6.87 million; West Florida, 2,501,475 pounds, $5.47 million; Alabama, 72,776 pounds, $243,414.

53. According to NOAA and credible scientific evidence, there are three species of crabs in the Gulf of Mexico area: blue crab, Gulf stone crab, and stone crab. Blue crab occurs almost exclusively in state waters with peak spawning occurring in August-September. Eggs and larvae develop and settle in the estuaries until crabs reach harvestable size in April-May. The Gulf stone crab is relatively abundant in the Louisiana, Mississippi and Alabama nearshore areas in the spring period. The stone crab distribution is relatively limited.

54. According to NOAA and credible scientific evidence, Blue crabs are the most economically valuable crab species for the region. Louisiana lands approximately 26 percent of the total blue crabs for the nation or 41.6 million pounds in 2008, with a dockside value of $32 million. Landings and dockside values for the other Gulf states were: West Florida, 2.7 million pounds, $3.3 million, Texas, 2.6 million pounds, $2.3 million, Alabama, 1.8 million pounds, $1.5 million, Mississippi, 450,000 pounds, $447,000. Crabs are food source for many species such as redfish, cobia, etc.

55. According to NOAA and credible scientific evidence, the surface-oriented species in federal waters will be most harmed by the early stages of the oil spill. As the crude oil sinks, the bottom-oriented fish community may be harmed. The major harms will be to near shore species or species that may be currently spawning.

56. In general, reef fish species in the Gulf of Mexico are associated with bottom topographies on the continental shelf, coral reefs, artificial reefs, rocky hard-bottom substrates. The majority of these species are inshore of the current location of the oil spill. According to NOAA, the oil spill will potentially harm fish larvae since several reef fish are currently spawning or will be spawning if the oil spill continues. Further, the dispurants that have been used are already believed to have destroyed 25% or more of the bottom fisheries in many areas.

57. According to NOAA and credible scientific evidence, mortality on larvae caused by the oil spill will result in declines in recruitment in future age classes. This will negatively harm the rebuilding plans for these species, as well as short- and potentially long-term economic harms on commercial fisheries in the Gulf of Mexico.

58. Juvenile red snapper are common on mud bottoms in the northern Gulf, particularly off Texas through Alabama. Also, some juvenile snappers (e.g. mutton, gray, red, dog, lane, and snappers) and groupers (e.g., red, gag, and yellowfin groupers) have been documented in inshore seagrass beds, mangrove estuaries, lagoons, and larger bay systems.

59. According to NOAA and credible scientific evidence, as the oil spill reaches the bottom or nearshore/inshore areas, the majority of the 42 reef fish species (which include juvenile snappers and groupers) in the Gulf of Mexico will be harmed.

60. According to NOAA, postlarvae and juveniles of menhaden and mullets (winter spawners whose juveniles are now entering the estuaries) may be affected by the oil spill. Depending on current Loop Current dynamics, Atlantic bluefin tuna may also be harmed by the oil spill. Atlantic bluefin tuna larvae may also be present in the region of the oil slick. Their presence however is quite dependent on and related to the Loop Current eddies and fronts.

61. According to NOAA, gray triggerfish and the amberjacks may also be harmed by the oil spill, if the Sargassum that they use for nursery habitat is contaminated by the oil spill.

62. The commercial landings and dockside value of red snapper, one of the more valuable finfish species, by state for 2008 was as follows: Texas, 869,966 pounds, $2.74 million; West Florida, 847,884 pounds, $2.94 million; Louisiana, 589,379 pounds, $2.03 million; Alabama, 60,391 pounds, $237,141, according to NOAA.

63. Shark species, including blacktip sharks, spinner sharks, Atlantic sharpnose sharks, bull sharks, tiger sharks, and whale sharks, are distributed throughout the Gulf region with the highest abundances in the central Gulf from Louisiana to Alabama. Blacktip sharks are particularly abundant in this region and are one of the most commercially important shark species in the Gulf.

64. During spring and summer months several shark species, including blacktip sharks, use coastal nursery areas, which NOAA expects to be harmed by the oil spill.

## COUNT ONE
## NEGLIGENCE

65. Plaintiff repeats and incorporates herein by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

66. Defendants owed a duty of care to Plaintiff to ensure the safe operation of the Deepwater Horizon, and to avoid the fire, explosion, and spill that occurred on April 20, 2010.

67. Defendants knew or should have known that the Deepwater Horizon presented a serious risk of fire, explosion, and spill into surrounding waters, which could, in turn, would cause harm to persons, property, and the natural environment.

68. Defendants knew or should have known that certain equipment utilized by the Deepwater Horizon was defective or not properly functioning.

69. Defendants knew or should have known that the cement used in the cementing of the well head was defective and/or or that the cementing of the well head was not done properly.

70. Defendants knew or should have known that significant amounts of petroleum were leaking from the Deepwater Horizon immediately following the April 20, 2010 fire and explosion.

71. Defendants' negligence includes, without limitation, the following:

   a. Failure to properly inspect and monitor the Deepwater Horizon and its equipment;

   b. Failure to properly and safely maintain the Deepwater Horizon and its equipment;

   c. Failure to properly and safely operate the Deepwater Horizon and its equipment;

   d. Failure to take adequate precautionary measures to prevent fire, explosion, and oil spills;

   e. Failure to properly design, manufacture, and install the blowout valve or blowout preventer;

   f. Failure to employ an acoustic switch in the blowout valve or blowout preventer;

   g. Failure to ensure that the blowout valve or blowout preventer was functioning properly and as intended;

   h. Failure to ensure that the concrete casing was sufficient;

   i. Failure to properly cement the well head and final production casing string.

72. As a direct and proximate result of Defendants' negligent conduct, Defendants have caused or will cause Plaintiff to suffer and continue to suffer financial and economic loss.

73. Defendants are further liable under the doctrine of *res ipsa loquitor* because the fire, explosion, and sinking of the Deepwater Horizon, and subsquent oil spill, could not have occurred in the absence of the negligence of Defendants.

## COUNT TWO
## OTHER ACTS OF NEGLIGENCE, GROSS NEGLIGENCE, AND STRICT LIABILITY

74. Plaintiff repeats and incorporates herein by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

75. Defendants' drilling of highly volatile and toxic fuel constitutes an abnormally or ultra-hazardous activity.

76. Defendants' drilling of highly volatile and toxic fuel within a relatively short distance from the shoreline inherently presents a high degree of risk and likelihood of substantial harm to persons, land, and property.

77. Due to the nature of Defendants' activity, the associated high risks could not have been eliminated through the exercise of reasonable care.

## COUNT THREE
## ALTERNATIVE CLASS ALLEGATIONS

78. Although it is preferable for this to be a single filed complaint, in the event that a class action becomes necessary, and if this Court requires such Plaintiffs, Plaintiff submits his namely as a class representative for the Mississippi Charter Boat Association. Plaintiff is well known in the community as a speaker for all representatives of the Charter Boat Association, and he has been a member of the association for many years. In addition, Plaintiff was president of the Mississippi Gulf Coast Fishing Banks. Hence, he has represented the Mississippi Gulf Coast Charter Boat Association on numerous occasions and if required to do so, he will do it again in this litigation.

79. Plaintiff brings this class action pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(3) and/or 23(c)(4)(a) on behalf of themselves and all others similarly situated. The proposed Class is defined as follows:

> All persons in the state of Mississippi who are members of the Mississippi Charter Boat Association who have lost, will lose or have decreased income as a result of the April 20, 2010 Deepwater Horizon oil rig fire, explosion, and resulting oil spill.

Excluded from the Class are Defendants, members of the immediate families or employees of Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which Defendants have a controlling interest or which is related to or affiliated with the Defendants, and the legal representatives, agents, heirs, successors-in-interest or assigns of any such excluded party.

80. The Class is so numerous, and their members so geographically dispersed, that joinder of all members would be impracticable. Given available evidence of the size of the Gulf fisheries that are likely to be impacted by the oil spill, numerosity is satisfied here.

81. Plaintiff's claims are typical of those belonging to members of the Class, as each Plaintiff, Class member has lost or will lose income as a result of the damages caused by the April 20, 2010 Deepwater Horizon oil rig fire, explosion, and resulting oil spill.

82. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel with extensive experience litigating class actions involving similar environmental and maritime damages.

83. Common questions of law and fact exist as to all members of the Class, and these questions predominate over any questions affecting solely individual Class members. Among the common questions are:

  a. Whether Defendants owed a duty of care to Plaintiff to ensure the safe functioning of the Deepwater Horizon and its equipment;

  b. Whether Defendants knew or should have known of the risk of fire, explosion, or spill presented by the Deepwater Horizon and its equipment;

  c. Whether Defendants' failure to use reasonable care caused the fire, explosion, oil spill, and Plaintiff's resulting damages;

  d. Whether Defendants' conduct constitutes an abnormally dangerous activity;

  e. Whether Plaintiff is entitled to damages pursuant to state common law claims alleged herein.

  f. The short and long term impact to the fisheries of the Mississippi Gulf Coast and its immediate surroundings.

84.  A class action is superior to other available methods for the fair and efficient adjudication of this matter as prosecution of separate actions by individual Class members would unduly burden the courts, and risk inconsistent adjudications of common questions of law and fact. The class action approach will achieve economies of time and expense, and will ensure uniform results and procedural fairness to all parties.

85.  The amounts at stake for Class members are not significant enough to merit individual actions against Defendants, although the aggregate amount is substantial. No Class member thus has a pragmatic interest in individually controlling the prosecution of this case. Plaintiff foresees no difficulty in the management of this class action.

## COUNT FOUR
## OIL POLLUTION ACT CLAIMS

86.  Although Plaintiff appears to be procedurally barred from making claims at this time under the Oil Pollution Act, Section 1013, Plaintiff reserves his right to file a claim under the Act at a later time and asks this Court to be given the opportunity to do so.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of all others similarly situated, prays for a judgment against Defendants as follows:

1. For economic, compensatory and punitive damages sustained by Plaintiff and;

2. For attorneys' fees and costs of litigation as may be allowable under applicable law;

3. For such other and further relief as the Court may deem just and proper.

Respectfully submitted this the 9th of June, 2010.

/s/ Stephen W. Mullins
**Stephen W. Mullins**
**LUCKEY & MULLINS, PLLC**

2016 Bienville Blvd
P.O. Box 990
Ocean Springs, MS 39564
Telephone: (228) 875-3175

*Counsel for Plaintiff*